# Allegheny Energy Supply Co., LLC v. Wolf Run Mining Co.

*Russell J. Ober Jr.,* for plaintiff.
*David G. Ries,* for defendants.

JAMES *J.,* May 2, 2011—On February 17, 2005, Allegheny Energy Supply Company, LLC and Monongahela Power Company entered Into a contract with Anker West Virginia Mining Company, Inc. Plaintiff Allegheny agreed to purchase approximately 20 million tons of coal from defendant Anker to be delivered to Allegheny's Harrison Power Stations. Shortly after the execution of this agreement the various Anker entities were acquired by international Coal Group. Allegheny

and Monongahela will be referred to as plaintiffs and the Anker and International Coal Group, Inc. entities will be referred to as defendants.

The Coal Sales Agreement called for plaintiffs to purchase all of the coal produced from the proposed Sycamore 2 mine. The agreement characterised the contract as a "life of the mine contract" and estimated that the mine contained not less than 20 million tons. defendants agreed to deliver the actual production from the mine during 2005. This production was estimated to be 500,000 tons. For 2006, the defendants agreed to deliver 150,000 tons per month beginning on October 1, 2006. Beginning in January 2007 through the expiration of the contract, defendants were obligated to deliver coal to plaintiffs at a rate of 1.8 million tons per year until the reserve of not less than 20 million tons was exhausted. The evidence clearly establishes that defendants never met these contract obligations.

Defendants have contended that their performance under the Coal Sales Agreement is excused under the force majeure provision of the Coal Sales Agreement and the doctrine of commercial impracticability. Several days of testimony were dedicated to the difficulties experienced at the Sycamore 2 mine.

The Coal Sales Agreement defines a force majeure condition as:

13.0 FORCE MAJEURE

13.1 As used herein, "force majeure" means any causes or circumstances beyond the reasonable

control and without fault or negligence of the party affected thereby or of its subcontractors or carriers, such as, acts of God, governmental regulation, war, acts of terrorism, weather, floods, fires, accidents, strikes, major breakdowns of equipment, shortages of carrier's equipment, accidents of navigation, interruptions to transportation, embargoes, order of civil or military authority, or other causes, whether of the same or different nature, existing or future, foreseen or unforeseeable, which wholly or partly prevent the mining, processing, shipment and/or loading of the coal by Seller, or the receiving, transporting and/or delivery of the coal by any carrier, or the accepting, utilizing and/or unloading of the coal by Buyer, but specifically excluding economic factors alone.

Based upon this definition, defendants would be excused from performance under the Coal Sales Agreement if they established that the causes or circumstances claimed to constitute force majeure were not based on economic factors alone. Defendants must also prove that the causes and circumstances were beyond the defendants' reasonable control and that they occurred without the defendants' fault or negligence.

Defendants officially notified Allegheny Energy of the existence of force majeure conditions in a letter dated August 25, 2008. This letter listed three conditions that created the force majeure circumstances. They were: (1) roof conditions; (2) the presence of an abundance of gas

wells; and (3) a change in the enforcement of regulations relating to mining in the vicinity of gas wells. In order to evaluate the claims of the August 25, 2006 letter. It is necessary to examine the events that took place between early 2005 and August 25, 2006.

The evidence establishes that defendants were apprised of the severity of the gas well problem even before they entered into the February 17, 2001 contract. The memos sent by Gary M. Hartsog of Alpha Engineering (a consultant hired by Anker) on January 24, 2005 and revised and re-sent on April 18, 2005 clearly list the large number of abandoned gas wells in the reserve and the difficulty in finding them. There was some speculation that the recipient of the January 24, 2005 memo (Dick Beauchamp of Anker) may not have received the memo. This was rebutted by the testimony that spelled out the means of delivery and a response by Beauchamp to the January 24, 2005 memo. Clearly defendants were on notice of the severity of the problem and took less than aggressive action to solve the problem.

The fact that later well searches were highly successful indicates that the gas well problem was not beyond defendants' reasonable control and that the serious problem occurred because of defendants' fault or negligence. The issue of roof conditions also fails as a force majeure condition. Evidence clearly establishes that the failed roof conditions were caused by poor mining equipment. Inexperienced miners using unsuitable equipment contributed to the roof failures. The inconsistency of the Pittsburgh Seam of coal was also a known factor. Again,

the fact that mining subsequent to the August 25, 2006 notice was successful and absent roof problems supports this finding. The defendants hired Dave Maynard to operate the mine when it reopened in 2007. The roof conditions, once offered as a force majeure condition, have been resolved by better mining practices.

Finally, the defendants' letter of August 25, 2006 lists a change in enforcement regulations relating to mining in the vicinity of gas wells. There is no evidence of any regulatory change with regard to mining near gas wells. Evidence indicates that MSHA always required documentation of how searches for gas wells were conducted. Nothing in this record indicates any change from that position from the time of the Hartsog Memos (January-April 2005) until the force majeure letter of August 25, 2006). Defendants were apprised of the gas well problem and the regulatory climate long before the gas well was breached in June of 2006.

Finally, defendants assert a defense of commercial impracticability under §2-615 of the Uniform Commercial Code. W.Va Code §46-2-615. This defense is not available to defendants because the Coal Sales Agreement specifically delineates the excuses for non-performance in a force majeure provision. In a prior ruling on summary judgment motion, a fellow member of this court described the force majeure provision of the Coal Sales Agreement as a "comprehensive description of events that excuse performance." The force majeure provision prohibits an excuse for non-performance based on economic considerations alone. Therefore, the parties have agreed to

assumption of greater liability. Because they have agreed to a comprehensive description of events that excuse performance, the defenses under §2-615 of the UCC are not available to either party.

The defendants have breached the Coal Sales Agreement of February 17, 2005. The breach has not been caused by Force Majeure as defined by Section 13.0 of the February 17, 2005 Coal Sales Agreement. Furthermore, the defenses under §2-615 of the UCC are not available to them. The court must now calculate the damages owed for the breach of this Coal Sales Agreement.

The Coal Sales Agreement states:

1.0 Term and Quantity

> 1.1 The term of this agreement (the "Term") shall be the period commencing on the date hereof (February 17, 2005) and ending on the date of exhaustion of the Reserve Commitment (as hereinafter defined)(the "Expiration Date").

It would appear from the terms of Paragraph 1.1 that the term of the contract is open ended and only ends when the reserve commitment is exhausted. This is the theory that defendants advance. In fact, defendants' expert projected continued mining of Sycamore 2 into the year 2031.

However, Paragraph 1.2 sets forth annual base amounts of production from the Reserve. The schedule begins in 2005 and under the minimum production rates set forth, the reserve is to be exhausted in 2015. The defendants were contractually obligated to produce not less than 1,800,000

tons of coal from 2007 until the reserve would be exhausted in 2015. Therefore, the parties never contemplated the extension of this agreement beyond 2015.

There has been conflicting testimony as to the remaining size of the reserve obligation. Experts for both parties have given estimates of 12.526 million tons or 15.409 million tons. I find the evidence to support a finding that 15.4 million tons are left in the reserve.

The plaintiffs' damages can be divided into the following categories:

(1) Past damages under §1.2;

(2) Prejudgment interest on past damages under §1.2;

(3) Past damages under §1.3;

(4) Prejudgment interest under §1.3;

(5) Future damages.

The Coal Sales Agreement called for any shortfall from the Sycamore 1 agreement was to be delivered from the Sycamore 2 mine at Sycamore 1 prices. This shortfall was set at 296,197 tons. Plaintiffs were billed at the Sycamore 2 rates for this tonnage and suffered damages in the amount of $2,046,737. Plaintiffs are also entitled to prejudgment interest in an amount of $409,796.

The coal sales agreement calls for specific tonnage to be delivered beginning in October 2006 until the coal reserve is exhausted. From October 2006 until the time of trial (December 31, 2010) defendants were obligated to deliver 7,201,260 tons of coal. Their actual delivery was

1,201,632 tons of coal. The nearly 6,000,000 ton shortfall caused plaintiffs to purchase replacement coal in the open market. Their additional expense of $11,304,332 including interest are proper damages. Arguments that plaintiffs' conduct in seeking cover coal was not in good faith or failed to mitigate their damages are not persuasive. They acted reasonably in the face of defendants' unexcused breach.

Finally, the record reflects that defendants are producing 480,000 tons of coal per year. They anticipate that a second section will be brought into production. defendants argue that production will reach 960,000 tons in 2014. A review of the record, particularly the string of e-mails dated August 10, 2006 (plaintiffs' Exhibit 521), and the conduct of defendants' officers and employees, establishes that defendants have no intention of increasing production at Sycamore 2. Further e-mails in the fall of 2006 show the defendants' decision makers had no interest in re-opening Sycamore 2 unless economic conditions allowed them to at least break even (see plaintiffs' Exhibits 65 and 66).

The Coal Sales Agreement calls for deliveries to be completed in 2015. Because of the ambiguity of defendant's intention to perform under the agreement, plaintiffs were justified in not covering the future shortfalls in 2006. However, at the time of trial, it was obvious that defendants would never produce 1,800,000 tons of coal per year from Sycamore 2. Therefore, it is reasonable to use the price of coal at the time of trial, $53 per ton. The difference between the contract price ($36.50) and the market price

($53) creates $90,343,028 in future damages.

## VERDICT

And now, May 2, 2011, at the conclusion of a bench trial before this court and after a review of the exhibits and briefs of all parties, this court finds as follows:

1.  The evidence fails to establish force majeure causes or circumstances as set forth in Paragraph 13 of the Coal Sales Agreement of February 17, 2005;

2.  The defense of commercial impracticability is not available to the defendants because:

    a)  the supervening events were foreseeable at the time of the execution of the Coal Sales Agreement and;

    b)  the parties, by mutual agreement, specifically excluded economic factors alone as a force majeure circumstance;

3.  The defendants have breached the Coal Sales Agreement of February 17, 2005 and, therefore, the defendants are liable to plaintiffs for the following damages;

    a)  Past damages §1.2 Sycamore 2
        and prejudgment interest        $11,304,332

    b)  Past damages §1.3 Sycamore
        1 and prejudgment interest       $2,456,533

    c)  Future damages                  $90,343,028
        Total Damages and Interest    $104,103,893